BEATTY, Justice.
Plaintiff, Charles W. Evans, appeals from the trial court’s judgment for Am-South Bank, N.A. (AmSouth), on plaintiff’s claim for conversion of Arabian horses and on AmSouth’s counterclaim for default on a promissory note. We reverse and remand.
A number of transactions between Evans and AmSouth occurred between August 1979 and June 1981. The relationship between Evans and AmSouth began on August 21, 1979, when Evans and his then-wife, Rosemarie Evans, borrowed $58,500 from AmSouth for the purchase of a home. The Evanses executed a “note and security agreement” to AmSouth, pledging as collateral a piece of real property in California which they owned. The note was due on May 16,1980, but the Evanses did not meet this deadline. Rather, in September 1980, the Evanses executed a renewal note, which AmSouth backdated to the original due date, May 16, 1980, and a new note for interest, pledging as collateral a stock trailer and a Ford pickup truck. Because the Evanses were still not meeting payments on the notes, AmSouth took another note and security agreement in January 1981, refinancing the past due interest on the original note, with the same trailer and truck, as well as “one Arabian mare” pledged as collateral. The unnamed Arabian horse pledged as collateral on this note is just one of several Arabian horses that plaintiff claims AmSouth converted. The other horses involved were pledged to AmSouth as collateral on two notes executed by Rosemarie Evans, plaintiff’s former wife.
In October 1979, Rosemarie borrowed approximately $3,500 from AmSouth and pledged two mobile homes as collateral. AmSouth lent Rosemarie an additional $8,700 in May 1980, for which she pledged a 1980 Dodge van as collateral. Rosemarie failed to make her payments on time on these notes, and, on May 22, 1981, she signed an “accommodation pledge of collateral” for each of her two previous notes, listing eight Arabian horses. At the same time, AmSouth agreed to provide the care of the horses in order that Rosemarie could arrange for the sale of the horses, the proceeds from which were to be applied to *612 her notes at the bank. Evans later found out about this arrangement. At trial, an assistant vice president of AmSouth testified that Evans had agreed to this arrangement; however, Evans testified that he had demanded a return of the horses and the bank refused. Rosemarie sold the horses and applied the proceeds to the payment of her notes at AmSouth.
The horses in issue were part of a horse breeding business operated by Evans and his wife, Rosemarie. Evans claims that Rosemarie had no interest in the horses and, therefore, that her pledge of them as collateral was invalid, making AmSouth’s acceptance of the horses as collateral, the subsequent arrangement for their care, and acceptance of proceeds from their sale as payment on Rosemarie’s notes tantamount to conversion. AmSouth alleged, however, that Rosemarie had an interest in the horses, and thus had the right to pledge them as collateral, sell them, and apply the proceeds to her debt to the bank.
There was conflicting evidence adduced at trial on the issue of whether Evans owned the horses with his wife, Rosemarie. The certificates of registration on the horses listed “Charles W. or Rosemarie T. Evans” as the recorded owner. Evans sought to prove, however, that such certificates were not evidence of ownership, but rather were used only to show the ancestry of the horses for the purpose of keeping the breed pure. Evans alleged that the bill of sale, rather than the certificate of registration, is the proper indicium of ownership. AmSouth also presented testimony to the contrary.
The jury returned a verdict for AmSouth on the complaint and on the counterclaim, and assessed damages against Evans. The court below entered judgment on the verdict. Evans’s motion for new trial was denied, and he appeals, contending, among other things, that the trial court erred in its charge to the jury regarding ownership of the Arabian horses.
During his oral charge to the jury, the trial judge stated, inter alia, the following:
“Now, I charge you in this case, ladies and gentlemen of the jury, if you find that Charles W. and Rosemarie Evans had equal ownership and equal right of disposition in the property, then Rosemarie Evans would have as much right to dispose of any horses to which that applied as Mr. Evans did. If, on the other hand, you are reasonably satisfied that Mr. Evans was the sole owner of these horses in the case, then he has established his cause of action against the bank. Now, if you find that Rosemarie had an equal ownership right with him in all the horses, and she disposed of them of her own free will, then the conversion count would be at an end, and you’d render a judgment for the bank.”
After the trial court had finished its oral charge to the jury, the plaintiff, out of the jury’s presence and before it retired, stated the following to the court:
“The plaintiff makes an exception to the refusal of the Trial Court to grant an additional instruction to the jury, charging the jury that a co-owner or tenant in common of personal property cannot convey the interest of the other co-owner or co-tenant in the property, and that to said extent the oral charge of the Court improperly stated the law on that question.” (Emphasis added.)
This statement of counsel complied with the requirements of Rule 51, A.R. Civ.P., in that it called to the court’s attention an allegedly improper (incorrect) statement of law on the subject of the right of a cotenant of personal property to convey the interest of the other cotenant. See Rule 51, A.R.Civ.P., which states in pertinent part:
“No party may assign as error ... the giving of an erroneous ... charge unless he objects thereto before the jury retires ... stating the matter to which he objects and the grounds of his objection. ..."
The effect of the trial court’s charge on equal ownership and equal right of disposition in the property was to state as the law that one cotenant of personal property is free to convey the entire inter *613 est. That is an erroneous statement of the legal principle. The general principle is stated in 20 Am.Jur.2d Cotenancy and Joint Ownership § 95 at 194 (1965):
“Since there is, merely by reason of the existence of a cotenancy, no agency relationship between the cotenants, the courts are agreed that one cotenant cannot ordinarily transfer or dispose of the interest of another cotenant in such manner as to be binding, unless duly authorized to do so. Nor can a cotenant, as a rule, bind his cotenants by any unauthorized attempt to alienate or encumber the entire estate or any specific part or portion thereof, or an undivided interest in any such portion. In the absence of authorization or ratification on the part of his cotenants, any dealing on the part of one cotenant in relation to the common property is a mere nullity insofar as their interests are concerned.”
See, e.g., Crommelin v. Fain, 403 So.2d 177 (Ala.1981); Howze v. Dew, 90 Ala. 178, 7 So. 239 (1890). Doubtless, the trial court was attempting to instruct the jury on the law applicable to the various contentions of the parties, which pertained to the several possible ways in which the interests here involved could have been transferred. But we have considered the entire oral charge and cannot conclude therefrom that the charge quoted above was correct. Because the theory of sole ownership of the horses in Mr. Evans was factually inconsistent with the theory of his “equal ownership” in the horses with Mrs. Evans, it was prejudicial to the plaintiff to give the instruction that Mrs. Evans’s “equal ownership” gave her “equal right” to dispose of the horses.
Plaintiff does not attack that part of the judgment in favor of the Bank on its counterclaim. Accordingly, that part of the judgment is affirmed.
For the error in giving the instruction complained of, the judgment must be reversed in part and the cause remanded.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
TORBERT, C.J., and MADDOX, JONES and SHORES, JJ., concur.